**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**James Richard CORTEZ, Defendant-Appellant.**

**No. 19599.**

United States Court of Appeals,
Sixth Circuit.

April 30, 1970.

Daniel T. Taylor, III (Court-appointed), Louisville, Ky., for defendant-appellant.

Ernest W. Rivers, Louisville, Ky., for plaintiff-appellee.

Before WEICK and CELEBREZZE, Circuit Judges, and O'SULLIVAN, Senior Circuit Judge.

O'SULLIVAN, Senior Circuit Judge.

James Richard Cortez appeals from a judgment entered in the United States District Court for the Western District of Kentucky upon a jury verdict convicting him of the three counts of an indictment. The indictment charged that on or about June 1, 1968, Cortez, having already been convicted of carrying a concealed weapon, transported a sawed-off shotgun from Washington, D. C., to Lexington, Kentucky, and had possession of such firearm, all in violation of 15 U.S.

C. § 902(e)—now 18 U.S.C. § 922(e)—and 26 U.S.C. §§ 5821, 5861 and 5811. The trial was held at Louisville, Kentucky, in April of 1969.

The appeal charges that the District Judge erred: First, in failing, in disobedience of the Fourth and Fifth Amendments to the United States Constitution, to grant appellant's pre-trial motion to suppress evidence proposed to be offered at trial; Second, in disobeying the commands of the Sixth Amendment by denying such pretrial motion; Third, in allegedly permitting the jury to pass upon purely legal questions involved in the search for and seizure of the involved shotgun; and Fourth, in denying appellant's motion for judgment of acquittal.

The government's admissible evidence was such as to permit the District Judge to make the findings of fact he did make in disposing of the motions addressed to him and to permit him to allow the jury to find, beyond a reasonable doubt, that Cortez was guilty of the charges of the indictment.

We affirm.

The events which provide the factual context of this case occurred during the late spring of 1968 when Louisville, Kentucky, was experiencing civil disturbances marked by some violence. Appellant Cortez was an identified participant in such disturbances, whether as an activist, contributing to the violence, or as a peacemaker dedicated to suppressing it. He apparently had gained some standing in, and the confidence of, the Negro community of Louisville. Engaged in efforts to control the disturbances were Colonel C. J. Hyde, Louisville Chief of Police, officers of the Louisville police force, including two Negro detectives, Taylor and Tinsley, Kentucky State Troopers, the Kentucky National Guard, and agents of the Federal Bureau of Investigation. From admissible evidence—sharply disputed in some particulars—the jury could have found the facts hereinafter recited.

About the end of May, rumors were abroad that there might be further and more colorful violence. The Chief of Police became aware of one rumor that there was a plan to dynamite an oil refinery. Aware of appellant Cortez' standing in the black community, he thought Cortez might be helpful in stopping the dynamiting if, in fact, there was such a plan.

On or about May 31, 1968, Chief Hyde requested the above-mentioned detectives, Taylor and Tinsley, to go to Cortez' room at the Stouffer Inn and ask Cortez if he would come down to headquarters and talk to Chief Hyde. Taylor and Tinsley had previously met Cortez on May 30, 1968. These officers, after completing other duties, arrived at Stouffer Inn at about 1:55 A.M., June 1, 1968. Cortez answered their knock upon the door of his room. He was dressed in a pair of black boots, dark pants, dark shirt, dark jacket and had a tam-like hat on his head. Tinsley told Cortez that the Chief would like to talk to him. Cortez asked what the Chief wanted to talk about and Tinsley told him he didn't know. Cortez then asked if he were under arrest and Tinsley told him no. Cortez then stated that, in that event, he would go down and talk with the Chief. Cortez and the two detectives proceeded to take the elevator to the lobby. When they arrived in the lobby, Cortez told detective Tinsley that he wanted to make a telephone call. Without interference by the detectives Cortez walked to the phones and placed a call to some place in Virginia, but apparently did not receive an answer. The company then got into the police cruiser with one of the officers riding in the back seat with Cortez, as required by police regulations. They arrived at police headquarters at about 2:15 A.M., and went to the homicide room. There were some three officers in the homicide room at the time Cortez entered. Colonel Hyde was not immediately available. Upon entering the room, Cortez went over to where some chairs were, slammed down his jacket and tam and stated to Taylor that "we had

messed up." He said that by bringing him down to police headquarters they had destroyed his effectiveness with the FBI. Cortez told them that he was an informer for the FBI and he feared that the police had messed things up a couple of nights before because they had stopped an automobile in which two men by the names of Simms and Hawkins were driving. Presumably this intrusion prevented Cortez from exposing the plan of these men to get axes and dig trenches around the oil refineries in the west end. Cortez said he was supposed to purchase the dynamite at 5:00 A.M. that very morning and that Simms and Hawkins and others had planned to blow up the oil refineries in the west end of Louisville. He inferred that he was to frustrate the planned dynamiting. When Cortez first mentioned that he was an informer for the FBI, he named three agents, Glover, Ferguson and Woodruff, and said if the police would call these agents they would verify that fact. Cortez stated that he was paid the sum of $75.00 a week by the FBI and was provided an apartment, rented for him in Washington, D. C., by the FBI. He also had the phone number of Agent Glover which they were to call. Cortez advised that Glover had requested him to go to New York to the SNCC office and steal a shotgun and bring it back to Washington, D. C. He inferred that this mission had been accomplished. He then told the officers, including a then present Sergeant Alexander, that he had the shotgun in Room 315 at Stouffer's Inn, and told them to go and get the gun and bring it over to headquarters so that it could be given to Agent Glover, who would confirm Cortez' explanation of his possession of it. He said the gun was in an attache case and was broken down in three pieces.

After Cortez volunteered this information, Taylor related it to an officer Fry. Fry came to the homicide room and was introduced to Cortez. Taylor and Fry then left the room and thereafter returned with a warrant for the arrest of Cortez. This warrant charged

Cortez with creating a public nuisance by inciting a riot, contrary to Kentucky law. The warrant was read to Cortez and he was then advised of his constitutional rights. The arrest occurred at approximately 2:55 A.M. Cortez stated that he knew his rights. Prior to Cortez' volunteered story about his FBI connections, no officer had knowledge of Cortez' possession of a sawed-off shotgun, nor of his claimed purpose to block the dynamiters. None of the detectives interrogated Cortez prior to his volunteered statement. In fact, they did not have any opportunity to ask Cortez any questions before he told of his claimed connection with the FBI and the location of the gun.

After Cortez' arrest he was taken to a part of the jail called the holdover. On the way to the holdover, Cortez met Colonel Hyde and gave him the names of the three FBI agents and their phone numbers. Colonel Hyde wrote these names and numbers down. After his arrest, Cortez stated that he wasn't going to talk to anybody until they contacted the FBI. At about 7:00 A.M. that same morning, officer Fry instructed Tinsley to bring Cortez from the City Jail to police headquarters so he could talk with federal agents. When Cortez was informed of this, he told Tinsley:

> "Now, you're acting like you've got some sense. You are doing what you're supposed to do. You are getting somebody over here now that knows what they are doing."

Cortez gave the FBI agents, to whom he talked sometime after 7:00 A.M. June 1, essentially the same story he had related to Tinsley, Taylor and Alexander, with some minor exceptions. Cortez repeated that FBI agents in Washington requested him to get any information about guns that SNCC had. He said he got a sawed-off shotgun from SNCC headquarters and brought the gun from Washington, D. C., to Louisville, Kentucky. He said that the agents in Washington did not know that he had obtained the gun because he had not had

any chance to contact them before coming to Louisville.

Meanwhile, Sergeant Alexander, because of the press of work, did not go to get the gun until 5:00 A.M. He stated that he, along with two other officers, went to Stouffer's Inn, identified himself and told the clerk why he was there and got the key to Room 315. He found the attache case exactly where Cortez told him it would be. The case was not locked and upon looking inside, he saw the gun which was broken down in three pieces.

At trial, FBI Agent Glover from Washington, D. C., testified that Cortez had contacted the FBI office in Washington, D. C., on April 10, 1968, and advised that he had information to furnish. Agent Glover and Agent Woodruff had approximately ten contacts with Cortez, the last being May 22, 1968. Glover testified that he never advised Cortez to come to Louisville, Kentucky, and never instructed Cortez to steal a gun from SNCC headquarters.

Defendant took the stand in his defense. He denied that he had transported a sawed-off shotgun to Louisville and denied that he ever had such a gun in Louisville, or elsewhere. He inferred that the whole affair was a police frame-up; that the first time he saw the sawed-off shotgun, possession and transportation of which was the subject of his indictment, was when it was shown to him as a government exhibit by his attorney, while he was testifying at his trial. He stated that when the two Negro detectives from the Louisville Police Department came to his room at the Stouffer Inn, they "busted in" and placed him under arrest, handcuffed him, denied him opportunity to call an attorney, and transported him in custody to the homicide room at the police station. He denied that he told the police that he was secretly working for the FBI; denied that he had stolen the sawed-off shotgun from the SNCC headquarters in New York, and denied that he told the police officers to go to his room at the Stouffer Inn and get the sawed-

off shotgun. He insisted that he was in custody from the moment he left his room at Stouffers because the warrant which was served on him in the early morning hours of June 1 had already been issued on May 31, and, therefore, whatever statements he made about the gun and his request that the police get it from his hotel room all took place while he was in police custody and without having received the *Miranda* or any other required warnings. The prosecution's testimony was to the effect that the May 31 date on the state warrant was a clerical error.[1]

The factual issues thus made were resolved, properly in our view, against Cortez, first by the District Judge in denying appellant's pretrial motion, and later by the jury's verdict. We discuss the charged errors as follows:

1. Search and seizure—pretrial motion.

■■■ Appellant insists that the statements allegedly made by him advising of the presence of the sawed-off shotgun in his hotel room and his account of how he came to have it were made by him while in custody and without having been given the *Miranda* warnings. Therefore, he argued, consent given under such circumstances could not be used as a substitute for a valid search warrant. Upon pretrial motion, the District Judge, after taking evidence, found as a fact that Cortez did voluntarily direct the obtaining of the gun from his room at a time when Cortez was not in custody or under arrest. The District Judge correctly observed:

"Whether or not the defendant was in custody from the time law enforcement officers entered the motel room is determined not merely from the defendant's subjective feeling as to whether he was under arrest, but also from the nature of police intentions and actions in light of the surroundings."

Such is a correct statement of applicable law. Hicks v. United States, 127 U.S. App.D.C. 209, 382 F.2d 158, 161 (1967). The District Judge further found that,

"the defendant consented to a warrantless search of his hotel room and seizure of the weapon now in police custody without duress or coercion, actual or implied. * * * Under such circumstances, the warrantless search and seizure was conducted pursuant to an effective consent."

The District Judge recognized and applied the rule that where consent is relied upon to justify a warrantless search, the burden is on the government to establish the voluntariness of the consent. Watson v. United States, 101 U.S.App.D.C. 350, 249 F.2d 106, 108 (1957); United States v. Goosbey, 419 F.2d 818, 819 (6th Cir. 1970). We are satisfied that at no time prior to the arrest of Cortez on a state warrant were the circumstances such that it was required that warnings be given as required by Miranda v. Arizona, 384 U.S. 436, 444, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

2. Failure to provide counsel.

■■■ Appellant asserts that the officers denied him the opportunity to call a lawyer, and that disclosure of the whereabouts of the gun and other statements allegedly made by Cortez were made while he was "in the focus of guilt" un-

---

1. The state warrant for the arrest, and the warrant stub book, show that the warrant was issued May 31, 1968, but served at 2:55 A.M. on June 1, or 4:21 A.M. on May 32, 1968. The government's evidence was that any date or time other than 2:55 A.M. on June 1, 1968, was erroneous. Although some numbers in the stub book before the one here involved, No. 33365, showed the date of May 31, 1968, two other numbers, 33360 and 33361, lower numbers than 33365, were issued on June 1. One later number, 33375, showed a date of May 1, 1968. The officers who obtained warrant No. 33365 testified that it was issued on June 1 at about 2:55 A.M. and served immediately thereafter. Their testimony could have been believed over the confused evidence provided by the dates on the warrant and the stub book.

aided by the presence of counsel. The District Judge, however, found that Cortez was not in custody, or in the focus of guilt, at the time of his statements about the gun, its whereabouts, and how he got possession of it. Under such circumstances, neither Escobedo v. Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964), nor Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), required the presence of counsel or advice to Cortez that he was entitled to counsel. The officers' testimony was that no request for counsel was made by Cortez during the time in question. We do not consider that the rules of Mathis v. United States, 391 U.S. 1, 88 S.Ct. 1503, 20 L.Ed.2d 381 (1968), Orozco v. Texas, 394 U.S. 324, 89 S.Ct. 1095, 22 L.Ed.2d 311 (1969) or Davis v. Mississippi, 394 U.S. 721, 89 S.Ct. 1394, 22 L.Ed.2d 676 (1969), cited by appellant, were offended by what was done in the District Court. The information about the gun, Cortez' claims that he had been acting for the FBI, and his request that the officers get the gun from his room, were not the product of interrogation by the police, but were found to be spontaneous and voluntary.

3. Submission of constitutional questions to jury.

The District Judge instructed the jury as follows:

"The critical time of the trial of this case is from the knock on the door of Stouffer's Inn until such time as the warrant was served and the warning given. In the trial of this case, the Court has allowed the jury to hear evidence of conditions surrounding the alleged making by the defendant Cortez of certain statements and admissions and the alleged granting by him of his consent to a search of his motel room at Stouffer's Inn.

"The law of the United States provides that at the very instant of the focus of guilt upon a person before custodial interrogation of him begins, such person must have been told and understand that he is not required to make any statement or to do any act

and that any statement or any act which he might make or do can be used against him in court and further, he is entitled to the assistance of counsel if he wants one before making any statement or doing any act and that if he is without money to retain a lawyer of his own choice, one will be appointed to advise him free of cost. "Accordingly, even though I have allowed you to hear evidence about these matters between the time of the knock on the door and the serving of the warrant and the giving of notice, if you should believe that at the time the defendant Cortez purportedly made such statements and/or purportedly gave such consent to search his hotel room that the focus of guilt had been placed upon him or that he was being subjected to custodial interrogation without such warning aforesaid having been given and it is admitted it had not been, then and in that event, as a matter of law, the jury must not consider his alleged admissions or the alleged consent to have been freely and voluntarily given and thus they are not supportive of the proof of guilt and the crime charged and you must acquit the defendant."

█ Appellant says that by these instructions, the District Judge allowed the jury "to decide the Fourth, Fifth and Sixth Amendment aspects herein, which are actually questions of law, instead of fact." By his instructions, the trial judge directed the jury to first resolve relevant factual issues and then gave the jury the law which they were to apply to their factual findings. This was correct practice. Jackson v. Denno, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964); United States v. Reeves, 377 F.2d 524, 525 (6th Cir. 1967). It is not claimed that the trial disclosed any new facts imposing a duty on the trial judge to reconsider and again rule on the issue of suppression of the evidence and the seizure of the gun. See Rouse v. United States, 123 U.S.App.D.C. 348, 359 F.2d 1014 (1966). At trial, appellant's only attempt at corroboration of

relevant facts came from a clerk at Stouffer's Inn. She testified that one of the officers flashed his badge and stated that they were going to the police station. She also testified that Cortez and the officers were at the front door on their way out when Cortez returned by himself to the desk to pick up a message that had been left there for him. The hotel clerk did not see any handcuffs, exhibition of guns, or any other conduct evidencing that Cortez was in custody.

4. Sufficiency of evidence.

■ Applying the rule that upon consideration of a motion for directed acquittal or motion for acquittal *non obstante,* the evidence is to be viewed in the light most favorable to the government, Glasser v. United States, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942); United States v. Carter, 311 F.2d 934, 940 (6th Cir. 1963), we are satisfied that the evidence was sufficient to allow the jury to find Cortez guilty beyond a reasonable doubt.

Judgment affirmed.