UNITED STATES of America, Plaintiff,

v.

Leon JONES et al., Defendants.

Crim. A. No. 1969.

United States District Court, S. D. Georgia, Dublin Division.

Dec. 1, 1972.

<br>

Edmund A. Booth, Jr., Asst. U. S. Atty., Augusta, Ga., for plaintiff.

John R. Thompson, Swainsboro, Ga., for Leon Jones.

Tyrus R. Atkinson, Jr., Atlanta, Ga., for Charlie Woodrow Smith.

Ray Gaskin; Downing, McAleer & Gaskin, Savannah, Ga., for Jimmie Lee Bailey.

LAWRENCE, Chief Judge.

I. ORDER ON MOTIONS BY JONES, BAILEY AND SMITH TO SUPPRESS EVIDENCE AND MOTIONS FOR SEVERANCE

(a) *Factual Background— Leon Jones*

Leon Jones is one of three defendants indicted for armed robbery of a bank at Rentz, Georgia, on August 30, 1972. He has moved to suppress the use of evidence at the trial in the form of five $100 bills which were taken from him after the crime. He contends that the currency was seized as a result of a warrantless and unlawful search of his person by state officers investigating the robbery.

Jones also moves to suppress evidence in the way of exculpatory but incriminating statements he gave to the officers and also a statement he made to special agents of the Federal Bureau of Investigation who interviewed him the afternoon of the robbery. He contends that the latter statement, though made after the "Miranda warnings" were given, was the fruit of the original unlawful seizure of the currency and that such statement is tainted by the prior violation of his rights.

Jimmie Lee Bailey who is named as a co-defendant along with Woodrow Smith in the first Count of the indictment moves to suppress as evidence the bills in question, claiming that they were taken from Jones as a result of a search and seizure which was violative of Jones' Fourth Amendment rights.[1] Bailey contends that such unlawfully obtained evidence cannot be used against him as a co-defendant any more than it can be used against Jones himself.

The third defendant, Charlie Woodrow Smith, also attacks the lawfulness of the evidence obtained in the search of Jones and the statements obtained from him. He challenges the search of the automobile allegedly used in the robbery, claiming an interest therein as a co-renter, along with Jones, of the vehicle.

Pursuant to Rule 41(e), F.R.Cr.P., an evidentiary hearing was held at Savannah on November 17th. A second hearing took place on November 27th. It was called by the Court for the purpose of supplementing the previous record wherever incomplete and clarifying it where uncertain. At the latter hearing evidence was also heard in connection with the motions to suppress evidence obtained in Atlanta which had recently been filed by Charlie Woodrow Smith.

The evidence reveals that on the morning of August 30, 1972, Harold Moorman, an agent of the Division of Investigation (formerly Georgia Bureau of Investigation), was in the Sheriff's office at Dublin. At that time he learned that the Bank of Rentz in Laurens County had been robbed; that the car used in the crime was a late model, gold-colored Chevrolet, and that three colored males were involved in the crime.

Moorman got in his car and headed south on Highway 441. A short time later he passed an automobile going in the opposite direction answering the description of the "get-away" car. There were three Negro male occupants who he did not identify. The tailpipe and muffler on the Chevrolet were dragging along the road and "fire was flying." He noted that it bore no license. Moorman turned around. The driver of the suspect car gave it the gas with Moorman in pursuit. When the latter reached Interstate 16 he did not see the Chevrolet. Apparently it turned east on reaching that highway.

At this point Moorman learned by radio that the car was being pursued on I-16 by the Laurens County Sheriff's unit. He proceeded to Rentz. There he was shown where the "getaway" car had backed up to the walkway in front of the Bank. In doing so the tailpipe and muffler had broken loose. A small piece was observed in the street.

Detective F. M. Burch of the Dublin Police Department had driven to Rentz. He left the Bank to look for the gold-colored Chevrolet. On reaching I-16 he learned from the State Patrol that a man named Register who runs a body shop near the city limits of Dublin had spotted such a car going into town on Highway 19 and that it had turned down Saxton Street. Burch and another officer proceeded to the vicinity of where the car was reported to have been seen. They went up and down 15 or 20 streets looking for it. At No. 140 Dudley Street he observed a car answering the description of the vehicle in question. It was backed into a carport 35 or 40 feet from

---

1. Jones is the sole defendant indicted in Count two which charges him with committing the same bank robbery charged in Count one against Bailey and Smith jointly.

the residence located at that address. This was around noon or shortly thereafter. Burch had observed from the street that the muffler was broken. He walked over to the carport and looked at the Chevrolet. The tailpipe had been wired up with a clothes hanger. There was a Fulton County license tag on the car.

Burch then went to the front door of the residence and knocked. He knew the house belonged to Charles Woodrow Smith, Sr. After identifying himself, he said he was looking for a car involved in a robbery and that the Chevrolet fitted its description. The Rentz Banking Company was not mentioned. Jones identified himself and said he was from Atlanta. He stated that the automobile parked in the carport was his. Burch asked if he minded him looking at it. Jones said, "No, sir." They went over to the Chevrolet. The detective opened the hood and noted that the engine was warm. Burch inquired whether the car had been driven. Jones' reply was that he had driven to "the store" that morning. The detective then asked him about the broken tailpipe. Jones explained that he had run the car into a ditch the night before on the way from Atlanta.

Burch then called the Sheriff's office by radio and stated what they had found. He requested assistance. R. Yates Ware, a deputy sheriff of Laurens County, arrived shortly with another officer and examined the car.[2] Deputy Ware then told Jones that he wanted to talk to him about a bank robbery. They went into the house. Burch was with them. Jones was informed by Ware that he wanted to check out the car and was asked if he would go to the Sheriff's office. He agreed. Ware asked for the keys to the Chevrolet and Jones handed same to him. The latter informed the deputy that the car was his. Ware says

that he is satisfied that Jones was "frisked" before leaving the house. He rode in the patrol car. Another officer drove the Chevrolet to the jail in which the Sheriff's office is located.

Up to this point no formal arrest had been made. Ware testified that he felt like "it was the right car but I was not sure." On arriving at the Sheriff's office they went to the "interview" room, a small room with one door and one window. No "Miranda warnings" were given. Jones was requested to show his identification and he pulled out a black wallet. Ware observed in the billfold what appeared to be a large amount of money. There was a $100 bill on top and other bills below it. From another part of the billfold Jones pulled out what Ware recalls to have been a license. The money was exposed to the latter's view. He remarked to Jones that it looked like a large amount of money and asked him to count it. There were five $100 bills. The deputy asked, "Mind if I look?" The wallet was then on the table. Jones pushed it toward Ware. The money was then in it. Deputy Ware took the wallet outside and called Sheriff Bussell at Rentz. The latter got in touch with the Federal Bureau of Investigation.

Ware testified that there was no interrogation by him concerning the robbery. He never told Jones that he was under arrest. He said that he did not consider him a suspect until he saw the large bills in the wallet. Asked on cross-examination whether he considered Jones under arrest, he replied that the "general idea" was that he "agreed to come to the Sheriff's office to clear up" the matter of the automobile.

Around 12:55 P.M. Special Agents Frank Spero and Frank J. Realis arrived at Dublin. They brought with them a list of the serial numbers on the "bait" money taken in the robbery. The numbers thereon matched those on the cur-

---

2. Ware had been notified about the bank robbery about 9:30 A.M. and had proceeded toward Rentz. About a mile below I-16 they had met a gold-colored Chevrolet with three colored occupants. It was travelling fast and the muffler was "striking fire." When the tailpipe was examined by him at the carport he observed that it was worn "real bad" from "scrubbing."

rency which had been in the wallet of Jones.[3] The latter was interviewed in the interview room. Informed of his "Miranda rights," he acknowledged that he understood and signed the "waiver of rights" form after reading it. The interview took place in the interview room. Jones was asked what could he tell them about the bank robbery. He said he knew nothing about it.

At this point he was asked what he knew about the money. Jones admitted that the bills were his. He was then aware that the serial numbers thereon corresponded with those on a list supplied by the Bank. He told the Agents that he had been at "Charlie Smith's house" and that he had come to Dublin to "pay a fine." He admitted that he had driven the car to the Bank of Rentz and stated that Bailey and an individual unknown to him were in the car. These two men entered the Bank and came back out with what looked like an adding machine which was covered over with something. He then drove them to Smith's house where the man he identified as Bailey gave him $500. Jones said that he then slept until he was awakened by the knock on the front door.

About 3:45 P.M. on the same afternoon Jones signed another advice of rights form. He had sent word to the Special Agents that he wanted to talk to them again. They did so. His second statement related to what happened after he left Atlanta and before he reached Dublin. Jones described the route taken by him. He also stated that enroute to Dublin he had stopped to "fix" the license plate.

After the interview Jones signed a form for "consent to search" of the Chevrolet. On the floor in the rear was found a plastic bag which had contained two pillow cases. The latter had been purchased that morning from a store across the street from the Bank. A search of the glove compartment revealed an Econo-car rental agreement of the Chevrolet. It was signed by Bailey as renter. Charles Woodrow Smith was a co-signer but not a co-renter.

Jones was arrested by an F.B.I. agent on a warrant sworn out after the interview.

At the first hearing he gave a statement not under oath. He said that he saw the "first policeman" when he was looking at the Chevrolet in the carport. After knocking at the front door Burch asked him for his identification and how much money he had. The officer informed Jones that he wanted to talk to him and stated that he was going to take the Chevrolet to the Sheriff's office. Jones claimed that his wallet was taken from him at the house on Dudley Street and not at the jail. He denied that the bills were in the "obvious" view of the detective. They were clipped and a fold of the wallet was over them.

## II. DO BAILEY AND SMITH HAVE STANDING TO SUPPRESS EVIDENCE SEIZED FROM JONES IF THERE WAS AN UNLAWFUL SEARCH?

One must have standing to move to suppress evidence obtained by an unlawful search. The constitutional right violated must belong to the person seeking to suppress illegally seized evidence or the fruits thereof. In Jones v. United States, 362 U.S. 257, 261, 80 S.Ct. 725, 731, 4 L.Ed.2d 697, the Supreme Court held that the term "person aggrieved" as used in Rule 41(e) means the victim himself "as distinguished from one who claims prejudice only through the use of evidence gathered as a consequence of a search or seizure directed at someone else." Suppression of the product of a Fourth Amendment violation can be urged only by one whose own rights have been infringed by the search itself. Alderman et al. v. United States, 394 U.S. 165, 89 S.Ct. 961, 22 L.Ed.2d 176. See

---

3. A total of $23,434.84 was taken from the Bank. Only $2,000 of this amount was bait money.

also Simmons v. United States, 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247.[4]

It seems clear that Bailey has no standing to move to suppress evidence obtained through a violation of Jones's constitutional rights. "The rights assured by the Fourth Amendment are personal rights, and the traditional view is that a person is aggrieved by a search and seizure only if his own protection under the Fourth Amendment has been infringed." 3 Wright, Federal Practice and Procedure, Criminal § 674. However, the application of the rule as to "standing" where there is a joint trial of the defendants and one of them successfully raises the question of illegal search of his person or property is not at all clear. "The issue of standing as it relates to multiple defendants has been the subject of considerable controversy." United States v. Curwood, D.C., 338 F. Supp. 1104, 1115, n. 33. In McDonald v. United States, 335 U.S. 451, 69 S.Ct. 191, 93 L.Ed. 153 it was held that the erroneous failure of the trial court to suppress evidence unlawfully seized from a co-defendant with standing to object was prejudicial to such party as well as to the defendant whose rights were violated.[5] In 1969 the Supreme Court rejected a contrary "expansive reading of the Fourth Amendment" and ruled that co-defendants and co-conspirators have no "special standing" and cannot prevent admission against them of information illegally obtained through electronic surveillance against another defendant. Alderman v. United States, *supra*, 394 U.S. 165, 89 S.Ct. 961, 22 L.Ed.2d 176.[6] See also United States v. Hoffa, D.C., 307 F.Supp. 1129, 1133–1134; United States v. Graham, *supra*, 391 F.2d 439, 446–447.

However, in a number of cases it has been held that the wrongful denial of a motion to suppress illegal evidence prejudices both the person making such motion as well as his co-defendants and that the right to have such evidence excluded cannot be limited to the defendant moving to do so.[7] See Rosencranz v. United

---

4. The numerous cases in which this rule has been followed include: United States v. Banks, 465 F.2d 1235 (5th Cir.) ; Gollaher v. United States, 419 F.2d 520 (9th Cir.), cert. denied 396 U.S. 960, 90 S.Ct. 434, 24 L.Ed.2d 424; Boyle v. United States, 395 F.2d 413 (9th Cir.), cert. denied 393 U.S. 1089, 89 S.Ct. 861, 21 L.Ed. 2d 782; United States v. Deegan, 410 F. 2d 13 (2nd Cir.), cert. denied 395 U.S. 935, 89 S.Ct. 1997, 23 L.Ed.2d 450; United States v. Mancusi, 379 F.2d 897 (2nd Cir.), aff'd. 392 U.S. 364, 88 S. Ct. 2120, 20 L.Ed.2d 1154; Bryson v. United States, 136 U.S.App.D.C. 113, 419 F.2d 695; United States v. Goad, 426 F. 2d 86 (10th Cir.) ; United States v. Masterson, 383 F.2d 610 (2nd Cir.), cert. denied 391 U.S. 909, 88 S.Ct. 1650, 20 L. Ed.2d 425; United States v. Carrion, 463 F.2d 704 (9th Cir.) ; Glisson v. United States, 406 F.2d 423 (5th Cir.) ; Bullock v. United States, 368 F.2d 483 (5th Cir.) ; United States v. Ahmad, D.C., 347 F.Supp. 912, 932 ; United States v. Resnick, 455 F.2d 1127 (5th Cir.).

5. Three justices concurred in the result or wrote concurring opinions while three dissented. "How this opinion was 'of the Court,' as the reporter describes it, is not easy to understand." Friendly, Circuit Judge, in United States v. Bozza, 365 F.

2d 206, 223 (2nd Cir.). See also 3 Wright, Federal Practice and Procedure, Criminal § 674n.; United States v. Graham, 391 F.2d 439, 445 (6th Cir.), cert. denied Tucker v. United States, 393 U.S. 941, 89 S.Ct. 307, 21 L.Ed.2d 278.

6. This case "greatly shakened" the authoritativeness of *McDonald*. See 3 Wright, Federal Practice and Procedure, Criminal § 674, supp. Professor Wright points out, however, that *Alderman* did not focus on whether evidence suppressed at the instance of a co-defendant with standing may be used against a defendant lacking standing.

7. It has been suggested by legal writers that a defendant should be able to object to the admission against him of *any* unconstitutionally seized evidence. See "Standing to Object to an Unlawful Search and Seizure," 1965 Wash.U.L.Q. 488; Wright, Federal Practice and Procedure, Criminal § 674, n. 71. In Mancusi v. De Forte, 392 U.S. 364, 366, 88 S. Ct. 2120, 20 L.Ed.2d 1154 the Supreme Court stated that the case was not a proper one for it to consider any modification of the "traditional doctrine" as to standing. Since then the doctrine referred to has been reaffirmed by that Court. See Alderman et al. v. United

States, 334 F.2d 738 (1st Cir.); Binkiewicz v. Scafati, D.C., 281 F.Supp. 233, 237. In United States v. Harris, 388 F.2d 373, 379 (7th Cir.) it is said that co-defendants possess standing if the person whose rights were invaded had standing. The Court referred to the overwhelming prejudice that would result if the evidence were inadmissible as to the aggrieved person but was admissible as to his co-defendants. See also United States v. Graham, *supra*, 391 F.2d 439. "[D]espite recent cases to the contrary, if the defendant with standing does move to suppress, the motion, if granted, should require suppression as to all defendants." 3 Wright, Federal Practice and Procedure, Criminal § 674. In the context of Professor Wright's statement (and it is based on *McDonald*) the author appears to assume that the ruling to suppress the evidence was made during the course of a *joint* trial of the defendants.

If the "bait money" was obtained from Jones as the result of a *lawful* search or if the "search" was consented to by him, the problem largely disappears. I will not know definitely whether it was legal until after an appeal in event of a conviction. Should the search be determined by me at this stage to have been unlawful, a way out of the dilemma exists in the severance of the three defendants and a separate trial for each. It seems to me that *McDonald* and *Alderman* and the pullulations of each are reconcilable by proper application of Rule 14.[8]

But before dealing with the severance question I should dispose of the issue of the validity of the search and seizure and the matter of exclusion of the product thereof—the five $100 bills and the incriminating statements to the F.B.I. given by Jones.

## III. WAS THE EVIDENCE WHICH IS SOUGHT TO BE SUPPRESSED UNLAWFULLY OBTAINED FROM JONES?

■ (a) As noted above, Detective Burch espied a 1972 gold-colored Chevrolet with a broken tailpipe and muffler parked in a carport in the vicinity where the "get-away" vehicle was reported to have been seen. His going over to the car for a better look was reasonable. Under the "plain view" doctrine he was entitled to examine the exterior of the car. The Fourth Amendment does not protect the owner of an automobile from the "searching eyes" of the "purposeful onlooker." United States v. Polk, 433 F.2d 644 (5th Cir.). See also United States v. Davis, 423 F.2d 974 (5th Cir.). The opening of its hood to determine whether the engine had been running is not entirely clear. However, in this Circuit opening an automobile door to obtain the identification number does not constitute a "search." I think that it was reasonable for Burch to do so under the circumstances. See United States v. Williams, 434 F.2d 681 (5th Cir.); United States v. Johnson, 413 F.2d 1396 (5th Cir.).

States, *supra*. Since I handed down the present Order the Court of Appeals for the Fifth Circuit has held that a co-defendant possesses standing under the Fourth Amendment despite the personal nature of such right. However, in that case the Government both charged and contended on trial that the joint defendants *jointly* possessed the counterfeit bills unlawfully seized from the purse of one of them. See United States v. Love and Sweda (1/9/73), 472 F.2d 490.

8. "Moreover, a decision that appellants here lack standing cannot significantly undermine the deterrent effect of the exclusionary rule upon police unlawfulness,

in view of the principle that evidence which is illegally seized from one person may properly be admissible against a third party who is tried separately. This is particularly true since, as noted above, the defendant who independently has and successfully invokes the right to move for suppression, would normally be successful in obtaining a severance to avoid possible prejudice. Had each defendant in the instant case been tried separately, or had Edge been granted a separate trial, appellants clearly would have lacked standing to object to the introduction of the fruits of the 'search' of the cars." United States v. Graham, *supra*, 391 F.2d 446.

(b) Nor do I think that there was any unlawful entry upon protected premises in order to get a closer view of the vehicle or that such occurred when the detective went to the front door and knocked without a search warrant.[9] When Jones appeared, Burch asked who he was and the former identified himself. Such a request for identification does not constitute a "custodial search." United States v. Marlow, 423 F.2d 1064 (5th Cir.); United States v. Cross, 437 F.2d 385 (5th Cir.).

(c) The damaging coincidences of which the law enforcement officers were then aware: the similarity of the 1972 Chevrolet in the carport to the late model "get-away" car; the broken tailpipe and muffler on both; the fact that the robbery automobile was seen headed toward Dublin and the vicinity in which the gold-colored Chevrolet was parked; the statement of Jones that the vehicle was his and that he had driven it that morning—all this adds up to probable cause for his detention and arrest. Surely the officers had reasonable cause to believe that the late model, gold-colored Chevrolet with a broken muffler that was used in the robbery that morning was the 1972 Chevrolet of the same color with a broken muffler and a warm engine found that morning parked in a carport in a Negro residential section. This was similar reason for believing that Jones who said he was from Atlanta and that the car was his and who had driven it that morning was one of the three blacks who fled Rentz in such a vehicle after the robbery. See Chambers v. Maroney, 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419, affirming United States ex rel. Chambers v. Maroney, 408 F.2d 1186 (3rd Cir.) and D.C., 281 F.Supp. 96; United States v. La Vallee, 367 F.2d 351 (2nd Cir.); United States v. Troutman, 458 F.2d 217 (10th Cir.); United States v. Skinner, 412 F.2d 98 (8th Cir.), cert. denied 396 U.S. 967, 90 S.Ct. 448, 24 L. Ed.2d 433. Probable cause is to be determined on the basis of the collective information of the officers involved rather than the one who makes the arrest. United States v. Troutman, *supra*. Cf. United States v. Ragsdale, 470 F.2d 24 (5th Cir.), 1972.

(d) Up to the time Deputy Ware requested Jones to come with him to the Sheriff's office to clear up certain things there was no detention, custody or arrest. The questioning at 140 Dudley Street was "on-the-scene questioning" and the investigation was of the "field" type to which *Miranda* was not intended to apply. However, when Jones was asked to get in the patrol car to go to the Sheriff's office things took on a different aspect. While not under formal arrest he was clearly under restraint. The Chevrolet in question was driven by a deputy to the jail. Jones was not free to move about. He was in custody.

Arrest does not require formal words or stationhouse booking. Reed v. United States, 401 F.2d 756 (8th Cir.), cert. denied 394 U.S. 1021, 89 S.Ct. 1637, 23 L.Ed.2d 48. To constitute an arrest there must be actual or constructive detention with intention to do so and so understood by the person restrained. Hicks v. United States, 127 U.S.App.D.C. 209, 382 F.2d 158. Under Georgia law it is sufficient to constitute an arrest if the person arrested understands that he is in the power of the one arresting and submits in consequence thereof. "Any restraint, however slight, upon another's liberty to come and go as he pleases, constitutes an arrest." Conoly v. Imperial Tobacco Co., 63 Ga.App. 880, 12 S.E.2d 398.

9. The "plain view" rule does not apply where the observing officer has physically invaded a constitutionally protected area in order to secure the view. United States v. Davis, 423 F.2d 974, 977–978, *supra*. However, it has been held that checking the serial number of a reportedly stolen vehicle parked in the owner's yard is reasonable and does not require a warrant. United States v. Johnson, *supra*, 413 F.2d 1396. Furthermore, prior to the second inspection of the Chevrolet permission to do so was given by Jones to Burch.

Whether a defendant is in custody is determined both by his subjective feeling as to arrest and the nature of police intentions and actions in the light of the surrounding circumstances. United States v. Cortez, 425 F.2d 453 (6th Cir.). It is not when the officer formally proclaims a person to be in custody but when one is effectively restrained and is cognizant thereof that matters. United States v. Washington, D.C., 249 F.Supp. 40, affirmed 130 U.S. App.D.C. 374, 401 F.2d 915. See also United States v. Davis, D.C., 328 F.Supp. 350, 352 and United States v. Birdsong, 446 F.2d 325, 328 (5th Cir.). "Our primary concern is not with the officer's state of mind but with whether, viewed in retrospect, the objective facts were such as to justify a prudent person in believing that he had enough facts on which to base an arrest before a search was made." United States v. Skinner, 412 F.2d 98, 102 (8th Cir.). See also Klingler v. United States, 409 F.2d 299 (8th Cir.). If there is significant interference with a defendant's liberty, the fact that the police did not intend to make a formal arrest or did not think that their actions constituted an arrest is irrelevant to compliance with Fourth Amendment standards. United States v. Stafford, D.C., 303 F.Supp. 785, 788.

When Jones entered the interview room at the Sheriff's office he walked into the "compelling atmosphere" mentioned in Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694. "Custodial interrogation" under that decision means "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." Miranda aims at combatting the effect on constitutional rights of the interrogation of an individual in a "police-dominated atmosphere." The prosecution must show that the warnings and the notice of rights required by that decision were given the defendant, including the right to remain silent, to consult with a lawyer and a warning that anything the individual says may be used against him.

No Miranda warnings were given to Jones by Deputy Sheriff Ware. Nor was any warning given him as to his right against unreasonable search. Specific advice as to the latter constitutional guaranty need not precede a request that a suspect consent to search. The latter is not invalidated thereby as a matter of law. United States v. Goosbey, 419 F.2d 818 (6th Cir.); United States v. Mancusi, 429 F.2d 61 (2nd Cir.). However, consent is not lightly assumed in the case of search and seizure. The burden is on the prosecution to show voluntariness by clear and convincing evidence. Bumper v. North Carolina, 391 U.S. 543, 88 S.Ct. 1788, 20 L.Ed.2d 797; Phelper v. Decker, 401 F.2d 232 (5th Cir.). A waiver is invalid unless the person consenting knows that permission may be freely withheld. Perkins v. Henderson (5th Cir.), 418 F.2d 441. The consent must be given unequivocally, specifically and intelligently. United States v. Vickers, 387 F.2d 703 (4th Cir.), cert. denied 392 U.S. 912, 88 S.Ct. 2069, 20 L.Ed.2d 1369.

(e) If evidence is obtained by an unlawful search or by means of custodial interrogation in the absence of proper warnings, neither the search nor the knowledge acquired thereby can be legally used in enforcing the law. Silverthorne Lumber Company, Inc. v. United States, 251 U.S. 385, 40 S.Ct. 182, 64 L.Ed. 319; United States v. Edwards, 441 F.2d 749 (5th Cir.). Under the exclusionary rule, an unlawful search infects evidence obtained through leads uncovered thereby. United States v. Paroutian, 299 F.2d 486 (2nd Cir.). Incriminating statements by a defendant, even though the Miranda rights are waived, which "trigger" or induce incriminating statements are the "fruit of the poisonous tree" and must be suppressed. United States v. Nikrasch, 367 F.2d 740 (7th Cir.); Barnett v. United States, 384 F.2d 848, 862 (5th Cir.);

Amador-Gonzalez v. United States, 391 F.2d 308, 318 (5th Cir.).[10]

(f) I have taken some pains in dealing with the rights of an accused under the Fourth, Fifth and Sixth Amendments and to point out the strict standards and heavy burden imposed on law enforcement officers where such constitutional guranties are involved. On the foundations of security against unreasonable search and seizure; not to be compelled to be a witness against one's self and right of the accused to "Assistance of Counsel" the federal courts have erected strong walls for protection of accused persons. These protective bulwarks have been largely erected on a case-by-case basis. Issues as to validity of a search and seizure or voluntariness of statements must be decided on the particular facts of the case. The decisions of the courts in this area abound with distinctions, subtleties, refinements and contradictions.

If every law enforcement officer were a lawyer, the situation would not be helped. The courts have trouble enough with the problem even with opportunity for full deliberation. The police officer on the front line of the war against crime must make crucial decisions with little or no time for reflection or analysis. All too true is a recent comment by an official of Americans for Effective Law Enforcement. "If the policeman has made even the slightest blunder, the defendant, no matter how much evidence of guilt, is returned to the streets, without any regard for the rights of those who were his victims or might become his victims." *Newsweek*, Dec. 4, 1972, p. 32.

(g) I hold that the discovery and seizure of the "bait money" in Jones's wallet did not violate his constitutional rights. I believe the testimony of Deputy Sheriff Ware that the bills were accidentally observed by him after he asked Jones for identification and the latter looked in his billfold.[11] Even if I discredited his version of what occurred in the interview room in respect to the contents of the billfold, the result would not be different. In the eyes of the law, Jones was then in detention. A search of his person and seizure of effects was incidental to such arrest and was reasonable.[12] Johnson v. Beto, 383 F.2d 544 (5th Cir.); United States v. Montos, 421 F.2d 215 (5th Cir.), cert. denied 397 U.S. 1022, 90 S.Ct. 1262, 25 L.Ed.2d 532; United States v. Sterling, D.C., 321 F. Supp. 1301; Acosta v. Beto, 425 F.2d 963 (5th Cir.), cert. denied Gonzales v. Beto, 400 U.S. 928, 91 S.Ct. 194, 27 L.Ed.2d 189; Stephens v. Lindsey, D.C., 304 F.Supp. 203, 205; Clements v. State, 226 Ga. 66, 172 S.E.2d 600. No denial of *Miranda* rights occurred. There was no custodial interrogation of Jones within the meaning of that case. Irrespective of whether the bills came into plain view of the officer and regardless of whether a voluntary consent was given by Jones to count the money, the arresting officer had the right to require him to empty his pockets and take possession of what was in them. See Davis v. United States, 409 F.2d 1095 (5th Cir.).

10. In the instant case Special Agent Spero frankly states that at the inception of his interrogation of Jones the latter denied any knowledge of the bank robbery. At that point defendant was shown the $100 bills. He knew that they had been identified by serial number. Thereupon Jones gave the F.B.I. the exculpatory but incriminating explanation of the presence of himself, Bailey and Smith at the Bank in Rentz.

11. A routine check for a driver's license during which a policeman observed in his wallet a stolen credit card is not product of illegal search. United States v. Marlow, 423 F.2d 1064 (5th Cir.). See also United States v. Nelson, 443 F.2d 908 (9th Cir.).

12. The fact that Jones was formally arrested later in the day on the federal charge of bank robbery under a warrant based on an affidavit sworn to by a Special Agent is not significant as respects the state detention. The state officers were authorized to make an arrest. Armed robbery is an offence under the laws of Georgia independently of the federal crime. Ga.Code Ann. § 26–1902.

The seizure of the "bait money" did not taint what Jones subsequently told the F.B.I. The statement such defendant gave to the Agents was voluntary. It was made with knowledge of his *Miranda* rights and he knowingly signed the advice of rights form.

The motion of Jones to suppress the evidence in question and his exculpatory statements to the Agents is denied.

## IV. CONFESSION OF CHARLIE WOODROW SMITH

When Detective Burch spotted the 1972 gold-colored Chevrolet in the carport on Dudley Street around 12:15 P.M. on August 30th, Leon Jones saw him looking at it. He was not the only person in the house who knew the law was around. Charlie Woodrow Smith and Jimmie Lee Bailey were there. When Burch knocked on the front door they had concealed themselves in the bathrooms. After the officers departed with Jones the two blacks left by a back window. Smith said they hitch-hiked to Atlanta but apparently they were driven there by the fourth defendant in this case, Dorothy Jean McNair. She has entered a plea of guilty to the charge of aiding and assisting Bailey and Smith to escape apprehension.

Smith told Special Agent Robert J. Parker of the Atlanta office of the F.B.I. this and much more. He admitted his participation in the robbery along with Jones and Bailey. The three men who were cab drivers in the Atlanta area decided to rob the Bank of Rentz because there were no "alarms" or police at that place. They rented the Chevrolet on the night of August 29th and drove to Dublin. The next morning Bailey and Smith entered the Bank. Both had revolvers. They asked a teller to change a bill. The robbery was then announced, said Smith. The money was put in a pillow case and covered over with a typewriter cover. The three men took a long route back to the Smith house in Dublin. In doing so they passed three or four patrol cars.

The money taken by them, $21,600, was divided three ways.

On September 3rd Agent Parker took the warrant for Smith's arrest to the residence of Emory Stephens at 2201 Brannen Road in Atlanta. Stephens was not home but a Negro female told him that Smith and Bailey had been there and had left. Later that day Stephens called Parker and said that a girl friend of Smith's had told him that money was concealed in the stereo in the sitting room of his residence. Smith had revealed to her where it was hidden and Stephens was to bring it to "Jackie" on Moreland Avenue.

Stephens did not want to become involved. When Parker arrived at the house he was invited in by the owner. The back of the stereo was unscrewed. In a plastic bag, stuffed in socks, they found around $4,000 in currency.

Smith could not be located by the F.B.I. Twice in the next ten days Parker was called by a man who gave his name as "Junior Smith." The caller was informed that it was true that he was being sought and that the best thing for him to do was to come on in. The second time "Junior Smith" called he told Parker that he had heard the money had been found. The latter replied that a lot of it was still missing. While in hiding Smith stayed for a time at a Holiday Inn where he registered under an assumed name. Later the F.B.I. learned that he was at the Cherokee Motel. On September 8th special agents descended on that place. A clerk having identified Smith by a photograph, Parker called his room and instructed him to back out with his hands up. Smith tried to get out of a window but he observed agents outside. Upon arrest a search revealed $600 in a back pocket and a chrome-plated 38 caliber revolver. A revolver of that description had been used in the robbery.

Smith was taken to headquarters after his arrest. There he was interviewed for an hour and twenty minutes. His

confession which I have summarized [13] was given to Parker and another agent after the *Miranda* warnings.

## V. MOTION OF SMITH TO SUPPRESS CERTAIN EVIDENCE AND STATEMENTS

Smith's motion to suppress embraces suppression of the following evidence: (a) the warrantless seizure of the 1972 Chevrolet; (b) the money found and seized in Stephens' residence in Atlanta; (c) the "admissions" made by defendant over the telephone to Special Agent Parker; (d) the $600 taken from Smith's person at the time of his arrest, and (e) his confession to the F.B.I. agents following his arrest in Atlanta. I take up the items sought to be suppressed in the foregoing order.

■ (a) The warrantless seizure of the rented Chevrolet from Smith's father's residence on Dudley Street could not have prejudiced him. The police had the right to inspect the vehicle which was in plain view. With the defendant Jones in custody and the automobile on private property "the police had ample reason to remove the car to the police station for safe-keeping." United States v. Smith, D.C., 340 F.Supp. 1023, 1028. A more promising area for suppression would seem to be the warrantless search of the vehicle later in the day which resulted in discovery of the Econo-car rental agreement under which the Chevrolet was rented to Jimmie Lee Bailey with Smith as co-signer. It is doubtful, however, whether Smith has any standing. He had no property interest in the vehicle and was not in possession of it when the search was made. See United States v. Mendoza, 473 F.2d 692 (5th Cir.); Sendejas v. United States, 428 F.2d 1040 (9th Cir.). Jones had said that the car was his and was in technical possession at the time of the search which was made pursuant to his formal and knowing consent. It was a valid search. The fact that Smith was prejudiced is not a good ground for suppressing the evidence obtained in the search. In any event, independently thereof, the Government could easily have traced the vehicle to the Econo-car concern through its tag number. The search at the jail merely accelerated discovery of the rental agreement. See United States v. Seohnlein, 423 F.2d 1051 (4th Cir.). There is also the matter of Smith's abandonment of the rented car. At the time of the search he had betaken himself from the Dublin scene with no apparent desire ever to see the gold-colored Chevrolet again. As to the effect of abandonment on standing to complain of a search, see Parman v. United States, 130 U.S.App.D.C. 188, 399 F.2d 559, cert. denied 393 U.S. 858, 89 S.Ct. 109, 21 L.Ed.2d 126.

■ (b) Smith moves to suppress the evidence in the form of the currency found in the stereo in the sitting room. He claims standing because he lived in the house. Apparently he and his common-law wife occupied a bedroom. There is no question about Stephens' consent to the F.B.I. to enter the sitting room and search the stereo. The owner of a house with whom a defendant lives may consent to the search of an area not specifically set aside for such occupant. United States v. Mojica, 442 F.2d 920 (2nd Cir.). See also United States v. Fentress, 452 F.2d 609 (9th Cir.). The motion to suppress the fruits of the warrantless search of the stereo is without merit.

■ (c) and (d) The contention that the admissions made by Smith in his telephone calls to Agent Parker before arrest should be suppressed because of lack of *Miranda* warnings is fribbling. So is defendant's claim that the seizure of the $600 found on his person was illegal. It was incidental to a lawful arrest.

---

13. The recapitulation of the evidence which appears above is almost entirely based on my notes of the evidentiary hearings.

They are not vouched for as far as detail is concerned.

(e) Smith also attacks the validity of his confession to the F.B.I. agents on the ground that upon his arrest which occurred about 10:00 A.M. on September 8th he was not carried before a magistrate but was taken to the F.B.I. headquarters where his confession was obtained. He was not taken before the magistrate until 2 P.M. In support counsel for Smith cites Mallory v. United States, 354 U.S. 449, 454, 77 S.Ct. 1356, 1 L.Ed.2d 1479, where it was said that after arrest a person should be arraigned before a judicial officer as "quickly as possible so that he may be advised of his rights and so that the issue of probable cause may be promptly determined." This argument overlooks the Omnibus Crime Control and Safe Streets Act of 1968 which addresses itself in part to the McNabb-Mallory rule. Title 18 U.S.C.A. § 3501 provides that in determining the issue of voluntariness the trial judge shall, among other things, consider the time elapsing between arrest and arraignment of the person making the confession. There is a proviso in the Act that such statement shall not be inadmissible solely because of delay in going before the magistrate if the person charged with crime made the confession (as occurred here) *within six hours after his arrest or detention.*

Smith's confession was free and voluntary. He agreed to the interview by the Special Agents; in fact, he "initiated the conversation," according to one of them. Before he confessed he received and acknowledged his *Miranda* rights. The Government need only show admissibility of a confession, including voluntariness and knowing and intended waiver, by a preponderance of evidence. Lego v. Twomey, 404 U.S. 477, 92 S.Ct. 619, 30 L.Ed. 2d 618; United States v. Watson (5th Cir.) 469 F.2d 362. Clearly it has done so. The motion by Smith to suppress his confession is denied.

## VI. MOTION TO SUPPRESS BY JIMMIE LEE BAILEY

Bailey was arrested at the Matador Motor Inn at Atlanta on the night of October 6th following a tip from an informer as to his whereabouts. He had registered under the name of James Simms, Waycross. After his arrest the sum of $60 in a paper bag and a .38 caliber revolver were found. He declined to make any statement to the F.B.I. Bailey's motion to suppress is cast in general terms. Every ground that he can raise has been previously and adversely dealt with in this Order. His motion to suppress is overruled.

## VII. SEVERANCE

Severance is grantable in the discretion of the trial judge under Rule 14, F.R.Cr.P. wherever an accused may be prejudiced by a joinder. McDonald v. United States makes it injudicious to try defendants jointly where a search has resulted in seizure of evidence damaging to one of the defendants. The use of the evidence obtained from the search of Jones could be prejudicial to his co-defendants in a joint trial. Under the circumstances, I think a severance should be granted as to him. By doing so the doctrine that Fourth Amendment rights are "personal" to the individual who is affected (*Alderman*) can be harmonized with the holding in *McDonald*.

The same considerations hold true of a joint trial of Bailey and Smith. The former refused to give a statement. Smith confessed and implicated Bailey. We also have the problem of Bruton v. United States, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476. The use in a joint trial of the diverse techniques employed by district judges in trying to guard the rights of a defendant where a co-defendant's confession incriminates him will be awkward and difficult.[14] It is by no

14. See Posey v. United States, 416 F.2d 545, 550–551 (5th Cir.) ; United States v. Kershner, 432 F.2d 1066, 1070–1071 (5th Cir.) ; United States v. Sidman, 470 F.2d 1158 (9th Cir.).

means certain that Bailey's counsel would have any opportunity to cross-examine his co-defendant, Smith. It is just as unlikely that the jury could fail to know that the *Bruton*-created "Mr. X", substituted for the name of Bailey in Smith's confession, was any other than his co-defendant should Smith and Bailey be tried together.

I see no other practical alternative than to grant the three motions for severance and try the defendants separately rather than jointly. Such will be done. The cases are set for trial the week of December 11th.