**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**George Joseph TROUTMAN, Defendant-Appellant.**

No. 71–1413.

United States Court of Appeals,
Tenth Circuit.

April 3, 1972.

Stephen K. Lester, Asst. U. S. Atty. (Robert J. Roth, U. S. Atty., on brief), for plaintiff-appellee.

Patrick F. Kelly, Wichita, Kan. (Render, Kamas & Kelly, Wichita, Kan., on brief), for defendant-appellant.

Before BREITENSTEIN, HILL, and McWILLIAMS, Circuit Judges.

McWILLIAMS, Circuit Judge.

By indictment, George Joseph Troutman, his brother, Kenneth Vern Troutman, and their brother-in-law, Jerry Eden Cox, were charged with the burglary of a federally insured bank in Sharon, Kansas, in violation of 18 U.S.C. § 2113 and 18 U.S.C. § 2. Cox pleaded guilty and the Troutman brothers stood trial. The jury adjudged George Troutman guilty, but were unable to arrive at a verdict concerning· his brother, Kenneth. George Troutman now appeals. We affirm.

Two points are raised on appeal: (1) the propriety of the trial court's reception into evidence of certain exhibits which are said to have been seized in an unlawful search and seizure; and, (2) the propriety of the trial court's ruling that George Troutman was not entitled to be tried separately from his brother. The illegal search and seizure issue requires some recital of the facts.

Shortly after three o'clock in the morning, the burglary· alarm in the Valley State Bank in Sharon, Kansas (a town of 280 inhabitants), sounded, and an interested citizen, who had formerly been the town marshal, upon hearing the sound, rushed to his front door to see what he could see. This person testified that he noticed but one automobile on the streets of Sharon which was being driven in a northerly direction toward .Highway 160. The witness and his wife immediately got in their car and also drove northward toward Highway 160 on a street paralleling the street on which the other car was being driven. The witness went on to testify that the car which he and his wife were following turned eastward on Highway 160 and drove out of Sharon toward Attica, another small Kansas village located ten miles east of Sharon on Highway 160. The vehicle in question was described as being a "late model car * * * a light colored top * * * the tail lights * * * resembled a Thunderbird tail light."

The witness and his wife then drove by the bank and noticed that the front door of the bank had apparently been pried open; whereupon they proceeded to the home of the town marshal and reported the matter to him, giving a description of the car which they had followed. The marshal immediately caused radio dispatches to be put out to the effect that the bank in Sharon had been burglarized and that persons believed to be the burglars were proceeding eastward out of Sharon on Highway 160 in a vehicle thought to be a Thunderbird.

Fred Freeman, Chief of Police for Attica, was on duty at the time and he heard a radio message that the Sharon bank had been burglarized and that the car in which the burglars were believed to be riding was proceeding westward on Highway 160 into Attica. Freeman was not apprised, however, by the particular radio dispatch which he heard that the car in question was believed to be a Thunderbird. In any event, at about the same time he heard the aforesaid radio dispatch, Freeman espied an automobile being driven eastward on Highway 160 and he gave pursuit.

Dean Goddard, a police officer in Anthony, Kansas, also heard a radio dispatch concerning the bank burglary in Sharon and he learned that the persons believed to be the burglars were heading east on Highway 160 in a "white over dark Thunderbird." Anthony is located east of Attica and so Officer Goddard proceeded to drive westward on Highway 160 in search of the Thunderbird. It was in this setting, i. e., with Freeman pursuing the suspected vehicle eastward out of Attica on Highway 160 and with Goddard coming from the other direction (toward Attica) on the same highway looking for a Thunderbird, that Freeman established radio contact with Goodard. Freeman informed Goddard that he had the car in question in sight and believed it to be a Thunderbird. Goddard in turn suggested to Freeman that when he (Goddard) saw the headlights of the approaching vehicle he and Freeman would simultaneously turn on

their red lights and thereby stop the vehicle. This was accomplished at a point about five miles east of Attica a short time before four o'clock on the morning of the burglary.

Freeman and Goddard got out of their respective vehicles, with Freeman pulling his pistol and Goddard displaying a riot gun. Freeman approached the driver of the stopped Thunderbird, who was subsequently determined to be George Troutman, and engaged him in conversation. Specifically, Freeman inquired of the driver as to where he was going and the response was "down the road." When Freeman then asked to see his driver's license, Troutman got out of the car. Freeman next noticed that another occupant of the car at about the same time opened the right hand door to the car and Freeman walked around to the other side of the car "to see what was going on." Freeman then observed laying on the ground "under the edge of the car * * * wrecking bars, hammers, some punches and some leather gloves and a flashlight." These items were taken into custody by the officers and the Thunderbird was then thoroughly searched, the search disclosing, among other things, a hatchet, a knife, three walkie-talkies, an electric drill and a drill socket extension.

Prior to trial, pursuant to Fed.R. Crim.P. 41(e), Troutman moved to suppress the use as evidence of the burglary tools taken in the search of his car, as well as those tools found laying beside the car on the ground. The basis for the motion was the belief that Troutman's arrest was unlawful and that the ensuing search and seizure was also unlawful. This motion upon hearing was denied. At trial the tools in question were offered into evidence and were received, and it is asserted that such constitutes reversible error on the part of the trial court.

It is Troutman's position that he was under arrest as of the moment Freeman with gun in hand approached his stopped vehicle and began questioning him and that Freeman at that particular

point in time did not have probable cause to effect the arrest. Such being the case, argues Troutman, the arrest was not a lawful one, and renders inadmissible all of the burglary tools subsequently recovered by the police. In this general connection, Troutman further argues that the arrest was made by Freeman alone, and that the issue of whether there was probable cause depends entirely upon the extent of Freeman's knowledge, and that any knowledge on the part of Goddard may not be considered. In this connection it is emphasized that Officer Freeman, unlike Goddard, did not know that the burglars were believed to be escaping in a Thunderbird.

The trial court agreed that the arrest was made at the time the officers stopped the Thunderbird and approached the stopped vehicle with drawn guns. However, the trial court held that under the circumstances the arrest was made by both Freeman and Goddard and that they not only had probable cause for arresting Troutman but would have been "derelict in their duty" if they had not so stopped the car in question. In thus holding, the trial court, among other things, noted that Highway 160 was not comparable to the New Jersey turnpike with its constant flow of traffic and that travel in that sparsely populated area of Kansas at three o'clock in the morning was not the usual. We generally agree with the trial court's analysis of this matter.

■ Where, as here, an arrest is made without a warrant, the arresting officer must have probable cause for making the arrest, otherwise the arrest is an unlawful one. It has been held that to constitute probable cause for an arrest it must be shown that at the time the officer makes the arrest the facts and circumstances within his knowledge and of which he has reasonably trustworthy information are such as would warrant a prudent man in believing that the person to be arrested has committed an offense. Draper v. United States, 358 U.S. 307, 79 S.Ct. 329, 3 L.Ed.2d 327

(1959), and Holt v. United States, 404 F.2d 914 (10th Cir. 1968), cert. denied, 393 U.S. 1086, 89 S.Ct. 872, 21 L.Ed.2d 799 (1969). This rule of probable cause has been described as a "practical, nontechnical conception affording the best compromise that has been found for accommodating these often opposing interests. Requiring more would unduly hamper law enforcement. To allow less would be to leave law-abiding citizens at the mercy of the officers' whim or caprice." Brinegar v. United States, 338 U.S. 160, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949). It has also been held that probable cause is to be determined by the courts on the basis of the collective information of the police involved in the arrest, rather than exclusively on the extent of the knowledge of the particular officer who may actually make the arrest. Smith v. United States, 123 U.S. App.D.C. 202, 358 F.2d 833 (1966), cert. denied, 384 U.S. 1008, 87 S.Ct. 1350, 18 L.Ed.2d 448 (1967).

■ Application of the foregoing principles to the facts of the instant case leads us to conclude, as did the trial court, that Officers Freeman and Goddard did have probable cause for turning on their red lights and stopping the vehicle in which the burglars were believed to be riding and then effecting an arrest of the vehicle's occupants. The car in question was placed near the scene of the burglary at the time of the burglary and was thereafter reported as heading eastward on Highway 160. The fact that no vehicle other than the one here in question was seen by either Freeman or Goddard till after the arrest is deemed to be significant. The scene of the burglary was a small hamlet in Western Kansas and we agree with the trial court that Highway 160 is not to be compared to the New Jersey turnpike. Actually, the geographic area here involved under the circumstances was pinpointed with a considerable degree of certainty. See in this general connection such cases as United States v. Thurman, 135 U.S.App.D.C. 184, 436 F. 2d 280 (1970), and United States v.

Skinner, 412 F.2d 98 (8th Cir. 1969), cert. denied, 396 U.S. 967, 90 S.Ct. 448, 24 L.Ed.2d 433 (1969). In sum, we hold that Officers Freeman and Goddard did have probable cause for arresting Troutman as they did.

Coleman v. United States, 137 U.S. App.D.C. 48, 420 F.2d 616 (1969), and Schnepp v. Hocker, 429 F.2d 1096 (9th Cir. 1970), involve factual situations somewhat akin to the present one. In the former, the arresting officer, based on information given the police, was on the lookout for a particular make of automobile, as was Goddard in the instant case; whereas in the latter case, the arresting officer, like Freeman, had only been advised that the burglars were effecting their escape in a particular vicinity in an automobile of an unidentified make. In each of those cases, based on the facts and circumstances there present, it was held that the arresting officer had probable cause to arrest without a warrant. Accordingly, we find no error in the trial court's determination that Troutman's arrest was lawful.

■■ As indicated, in arguing that the search of the automobile was unlawful, counsel stakes all on the premise that the earlier arrest was unlawful and that the seizure of *all* the burglary tools was the fruit of an unlawful arrest. Our determination that the arrest was lawful cuts down that argument. The arrest being lawful, the recovery of the burglary tools thrown from the car is permissible under the plain view doctrine. Harris v. United States, 390 U.S. 234, 88 S.Ct. 992, 19 L.Ed.2d 1067 (1967). And the facts and circumstances which rendered the arrest a lawful one, when coupled with the discovery of the burglary tools thrown from the car by one of its occupants, constituted probable cause for the thorough search of the automobile then made by the authorities on the open highway at four o'clock in the morning. The present case is well within the rule of such cases as Chambers v. Maroney, 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970), and

Carroll v. United States, 267 U.S. 132, 45 S.Ct. 280, 63 L.Ed. 543 (1925).

George Troutman also asserts that the trial court erred in denying his motion for a severance. The grounds advanced to the trial court as to why a severance should be granted were a bit vague, but there was the suggestion that the Troutman brothers might have inconsistent defenses, though the trial court was certainly in nowise fully informed. Upon trial, however, some degree of what might be described as conflict between George and Kenneth Troutman did develop. George Troutman elected not to testify. However, his brother Kenneth did testify, and the gist of his testimony was that, though present, he was asleep in the car and did not participate in any burglary. It is said that such tends to incriminate, inferentially at least, George Troutman.

■ The granting of a motion for separate trials lies within the sound discretion of the trial court and on appeal its ruling will not be upset except on a showing of clear abuse. And it has been held that hostility between defendants and the fact that one may try and save himself at the expense of a codefendant is not in itself sufficient to require separate trials. Dauer v. United States, 189 F.2d 343 (10th Cir. 1951), cert. denied, 342 U.S. 898, 72 S.Ct. 232, 96 L.Ed. 672 (1951).

■ Concerning this matter of severance, it should be emphasized that we are not here confronted by the factual situation present in Bruton v. United States, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968). In the instant case, none of the defendants made a confession. Hence, this is not an instance where the confession of one defendant which incriminates a codefendant is introduced as a part of the Government's case in chief. Rather, the conflict, such as it was, only developed when Kenneth Troutman took the stand as a witness in his own behalf and testified as previously indicated. Counsel for George Troutman had the opportunity to cross-exam-

ine Kenneth, if he so desired. United States v. Fersner, 416 F.2d 403 (4th Cir. 1969), cert. denied, 397 U.S. 954, 90 S. Ct. 982, 25 L.Ed.2d 137 (1970). Hence, there appears to be no denial of the Sixth Amendment right to confrontation. Accordingly, the rule of *Bruton* does not dictate that the Troutman brothers should have been afforded separate trials.

Judgment affirmed.