Dale Nolen STEVENS, Plaintiff,

v.

SANPETE COUNTY, a political subdivision of the State of Utah; Bruce Tidwell, individually and as a Sanpete County Deputy Sheriff; Manti City, a municipal corporation of the State of Utah; James D. Hillin, individually and as a former chief of police of Manti City; and Rees G. Rasmussen, individually and as a duly authorized and acting police officer of Manti City, Defendants.

No. C 83–1359J.

United States District Court,
D. Utah, C.D.

Jan. 9, 1986.

James A. McIntosh, Salt Lake City, Utah, for plaintiff.

Allan L. Larson, and Bruce R. Garner, Salt Lake City, Utah, for defendants Sanpete County and Bruce Tidwell.

Dennis Conroy, Salt Lake City, Utah, for defendants Manti City, James D. Hillin, and Rees G. Rasmussen.

MEMORANDUM OPINION
AND ORDER

JENKINS, Chief Judge.

This civil rights action arose out of the plaintiff's arrest for the alleged theft of

some snowmobiles and trailers. On October 2, 1985, the court heard oral arguments on motions by all defendants for summary judgment. It also heard arguments on the plaintiff's motion to add Paul R. Frischknecht, former Sanpete County Attorney, as a party defendant. James A. McIntosh appeared for the plaintiff. Allan L. Larson and Bruce R. Garner appeared for the defendants Sanpete County and Bruce Tidwell. Dennis J. Conroy appeared for the defendants Manti City, James D. Hillin and Rees G. Rasmussen. At that time the court granted summary judgment to Sanpete County and Manti City and took under advisement the motions of the individual defendants. The court also took under advisement the plaintiff's motion to add Paul R. Frischknecht as a party defendant. Having reviewed the record, the arguments of counsel and the applicable law, the court now enters this memorandum opinion and order.

## I. Facts

The plaintiff, Dale Nolen Stevens, owned a lot in Manti, Sanpete County, Utah, which bordered the property of one Cecil Cox. In October 1982, Mr. Cox's son Ronnie parked a snowmobile trailer carrying two snowmobiles behind the fence at the back of his father's property, next to his father's wood utility trailer, which was already there. The Coxes did not realize that the trailers and the snowmobiles were on the plaintiff's property since that property had apparently not been occupied for years. In November 1982, Stevens, who lived in Uintah County, came to Manti to work. Although he did not stay on his property while he was there, he did inspect the lot and discovered the trailers and snowmobiles. He went to the Cox house once to find out who owned the vehicles, but apparently no one was home. Soon after that his wife and son removed the vehicles from the Stevens property.

On December 13, 1982, Ronnie Cox discovered that the snowmobiles and trailers were missing and contacted the police. Defendant Rasmussen, a Manti City police officer, went to the Cox home to investigate the matter. While he and Ronnie Cox were examining the area where the vehicles had been parked, they met Stevens. When Rasmussen asked Stevens if he knew who had taken the snowmobiles, Stevens replied that he had them, but he would not say where they were. He added that he would not return them until someone paid him rent for the use of his property. Rasmussen thought he had probable cause to arrest Stevens for theft but left with Ronnie Cox to discuss the matter with Paul Frischknecht, the Sanpete County attorney. Perhaps thinking he could resolve the matter without legal action, Frischknecht went and spoke with Stevens, who repeated what he had told Rasmussen. When Stevens refused to return the vehicles unless he was paid for having stored them, Frischknecht returned to his office, where he prepared a criminal information and a warrant for Stevens's arrest.

Meanwhile, Stevens decided to go to Provo to see his attorney. Rasmussen saw him leave and notified Frischknecht. The County Attorney told Rasmussen to have the warrant executed by a justice of the peace, which he did. Rasmussen also had the Manti City Police Department issue a radio broadcast for the northern part of Sanpete County notifying peace officers that Stevens was wanted for felony theft. Defendant Tidwell, a Sanpete County deputy sheriff, and Chris Larsen, a Mount Pleasant police officer, stopped Stevens in Mount Pleasant, Sanpete County, in response to the bulletin. Defendant Hillin, then chief of the Manti City Police Department, went to Mount Pleasant and brought Stevens back to Manti. The charges against Stevens [1] were eventually dropped after he returned the trailers and snowmobiles and a new County Attorney took over the case.

---

**1.** Stevens was charged with theft. Under Utah law theft is punishable as a second-degree felony if the value of the property stolen exceeds $1,000. Utah Code Ann. § 76–6–412 (1978). The snowmobiles and trailers had a value of over $1,000.

Stevens later brought this action under 42 U.S.C. §§ 1981 and 1983 claiming that his arrest and detention violated his civil rights.[2] He also alleged various state law claims, for assault and battery, false arrest, false imprisonment, intentional infliction of emotional distress, malicious prosecution, malicious abuse of process, negligence, and gross negligence, and sought to have expunged the criminal record created by his arrest.

## II. Stevens's § 1983 Claim

The only independent basis for federal jurisdiction in this case is the plaintiff's section 1983 claim. Section 1983 makes subject to civil liability any person who, under color of state law, deprives any citizen of "any rights, privileges, or immunities secured by the Constitution and laws" of the United States. 42 U.S.C. § 1983 (1982); see also 2 J. Cook & J. Sobieski, Jr., Civil Rights Actions ¶ 7.05 at 7–8 (1985). There is no question that the defendants were acting under color of state law in their dealings with Stevens. The only question is whether they deprived him of any constitutional right.

Stevens asserts two different bases for his section 1983 claim. First, he claims that his arrest violated his fourth amendment right to be free from unreasonable seizure.[3] Second, he claims that his arrest and subsequent detention constituted malicious prosecution and an abuse of process in violation of his rights under the fourteenth amendment, in that the criminal charges against him were instituted for the

sole purpose of recovering the Coxes' property.

### A. Unlawful Arrest

An arrest can give rise to a section 1983 action if it violates fourth amendment rights. Monroe v. Pape, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1967), overruled on other grounds, Monell v. Department of Social Servs., 436 U.S. 658, 663, 98 S.Ct. 2018, 2021, 56 L.Ed.2d 611 (1978). Whether or not Stevens's arrest violated his fourth amendment rights depends on whether or not it was based on probable cause. See United States v. Watson, 423 U.S. 411, 96 S.Ct. 820, 46 L.Ed.2d 598 (1976) (a felony arrest, without more, does not violate the fourth amendment if it is based on probable cause). The parties have spent much time discussing the issue. The issue is a fairly debatable one but one which the court need not decide, since, even if Stevens's arrest was improper, under the facts of this case the defendants are immune from suit.[4]

Lower federal courts have consistently held that law enforcement officials are entitled to qualified immunity in section 1983 actions where the plaintiff claims a fourth amendment violation, see, e.g., Lavicky v. Burnett, 758 F.2d 468, 475 (10th Cir.1985); Street v. Cherba, 662 F.2d 1037, 1039 (4th Cir.1981) ("It is far too late in the day to argue that qualified immunity is not a defense available to [such] defendants"), even when they make a warrantless arrest without probable cause, Smiddy v. Varney, 665 F.2d 261, 266 (9th Cir.1981), cert. denied,

---

2. Section 1981 of title 42 provides that "[a]ll persons within the jurisdiction of the United States shall have the same right ... to the full and equal benefit of all laws and proceedings for the security of persons ... as is enjoyed by white citizens, and shall be subject to like punishments, pains, [and] penalties...." Courts have interpreted this section to provide a cause of action only for racial discrimination. See, e.g., Boling v. National Zinc Co., 435 F.Supp. 18, 20 (D.Okla.1976). The plaintiff, an American Indian, has not alleged that he was discriminated against because of his race, nor is there any basis in the record for finding such discrimination. Therefore, to the extent the plaintiff's claims are based on section 1981, they must fail.

3. It is only the fact of his arrest and detention that need concern the court. Stevens concedes that he was not mistreated while under arrest.

4. Defendant Tidwell argues that he is immune because the arrest was pursuant to a warrant. Although as a general rule police officers do not violate the Constitution when they rely on a facially valid warrant, see, e.g., Baker v. McCollan, 443 U.S. 137, 145–46, 99 S.Ct. 2689, 2694–95, 61 L.Ed.2d 433 (1979), there is a disputed factual question as to whether the warrant in this case had issued when Stevens was stopped in Mount Pleasant, making summary judgment on that ground inappropriate.

459 U.S. 829, 103 S.Ct. 65, 74 L.Ed.2d 66 (1982); *Walters v. City of Ocean Springs,* 626 F.2d 1317, 1322 (5th Cir.1980); *Scott v. Donovan,* 539 F.Supp. 255, 258 (N.D.Ga. 1982).[5]

The reason for extending qualified immunity to police officers has been explained as follows:

> It is necessary that police officers be immune when they reasonably believe that probable cause existed, even though it is subsequently concluded that it did not, because they "cannot be expected to predict what federal judges frequently have considerable difficulty in deciding and about which they frequently differ among themselves."

*Smiddy v. Varney,* 665 F.2d at 266 (quoting *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics,* 456 F.2d 1339, 1349 (2d Cir.1972) (Lumbard, J., concurring)). "Immunity serves, in part, to delimit the degree of culpability required before the 'shield of immunity' will be lifted from a public official.... Immunity also rests upon considerations of public policy: ... the potential 'chill' upon law enforcement activities which the possi-

bility of personal liability might create." *Briggs v. Malley,* 748 F.2d 715, 719 (1st Cir.1984), *cert. granted,* — U.S. —, 105 S.Ct. 2654, 89 L.Ed.2d 271 (1985).

The Supreme Court redefined the scope of qualified immunity in *Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). Prior cases had held that there was both a subjective and an objective element to the good-faith defense. *See, e.g., Farmer v. Lawson,* 510 F.Supp. 91, 95 (N.D.Ga.1981). *Harlow* did away with the subjective element and established an objective test for determining immunity.[6] "The conduct of state and government officials is to be measured by an 'objective reasonableness' standard; conduct which violates 'clearly established statutory or constitutional rights of which a reasonable person would have known' will support § 1983 liability." *Briggs v. Malley,* 748 F.2d at 718 (quoting *Harlow,* 457 U.S. at 818, 102 S.Ct. at 2738). Where a police officer's conduct is objectively reasonable, "as measured by reference to clearly established law," he is shielded from liability for civil damages. *See Harlow,* 457 U.S. at 818, 102 S.Ct. at 2738.[7] In other words, the

---

**5.** The Supreme Court has never specifically so held. In *Pierson v. Ray,* 386 U.S. 547, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967), the case relied on as establishing the qualified immunity defense for police officers, the Court held that "the defense of good faith *and* probable cause" was available to officers in a § 1983 action based on an arrest under a statute later declared unconstitutional, 386 U.S. at 557, 87 S.Ct. at 1219 (emphasis added), suggesting that the officers must show both that they acted in good faith and that they had probable cause for their actions. However, if there was probable cause for the arrest, there was arguably no constitutional violation in the first place, and the Court would never have had to reach the question of defenses. Subsequent lower court decisions have read *Pierson* as though it were phrased in the disjunctive ("or") and have recognized a good-faith defense irrespective of whether there was probable cause. *See, e.g., Varela v. Jones,* 746 F.2d 1413, 1417–18 (10th Cir.1984); *B.C.R. Transp. Co. v. Fontaine,* 727 F.2d 7, 10 (1st Cir.1984); *see generally* Annot., 61 A.L.R.Fed. 7 (1983) and cases cited therein.

**6.** In doing so, the Court recognized that inquiries into a defendant's subjective good faith are often expensive and time-consuming. As

such, the Court stated, they had proven "peculiarly disruptive of effective government," 457 U.S. at 817, 102 S.Ct. at 2737 as well as "incompatible with our admonition ... that insubstantial claims should not proceed to trial," *id.* at 815–16, 102 S.Ct. at 2737. The objective standard the Court adopted was meant in part to permit the resolution of insubstantial claims on summary judgment. *Id.* at 818, 102 S.Ct. at 2738.

**7.** The Supreme Court has not expressly applied the *Harlow* standard to § 1983 actions involving police officers. In fact, *Harlow,* a case involving White House aides, specifically reserved the question of whether the same standard would apply to state officials sued under § 1983. 457 U.S. at 818 n. 30, 102 S.Ct. at 2738 n. 30. But the Court's adoption of the standard to determine the good faith of police officers under the good-faith exception to the exclusionary rule, *United States v. Leon,* 468 U.S. 897, 104 S.Ct. 3405, 3421 n. 23, 82 L.Ed.2d 677 (1984), suggests that the Court would also apply the standard in determining § 1983 liability. *See Briggs v. Malley,* 748 F.2d at 718 (so concluding). Arguably, the standard should not apply at all in arrest cases. The *Harlow* holding was expressly limited to "government officials performing discretionary func-

defendants are immune from suit if a reasonable person in their position would not have known that he was violating Stevens's constitutional rights. *Lavicky v. Burnett,* 758 F.2d 468, 475 (10th Cir.1985); *B.C.R. Transp. Co. v. Fontaine,* 727 F.2d 7, 10 (1st Cir.1984). *See also Llaguno v. Mingey,* 763 F.2d 1560, 1569 (7th Cir.1985) ("The issue of immunity as redefined in *Harlow* is whether when the defendant violated the plaintiff's rights the law appeared to authorize the defendant's misconduct").

In determining the objective reasonableness of the defendants' conduct, it is important to remember the words of another court faced with an analogous situation:

Police officers can be expected to have a modicum of knowledge regarding the fundamental rights of citizens. Lawlessness will not be allowed to pervade our constabularies. However, in holding our law enforcement personnel to an objective standard of behavior, our judgment must be tempered with reason. If we are to measure official action against an objective standard, it must be a standard which speaks to what a reasonable officer should or should not know about the law he is enforcing and the methodology of effecting its enforcement. Certainly we cannot expect our police officers to

carry ... a Decennial Digest on patrol; they cannot be held to a legal scholar's expertise....

*Saldana v. Garza,* 684 F.2d 1159, 1165 (5th Cir.1982), *cert. denied,* 460 U.S. 1012, 103 S.Ct. 1253, 75 L.Ed.2d 481 (1983).

■ It was clearly established that Stevens had a constitutional right not to be arrested unless there existed probable cause for his arrest. What was not clearly established was whether there was probable cause to arrest Stevens for theft under the circumstances. And if a reasonable person in the defendants' position would have thought he had probable cause to arrest Stevens, the defendants cannot be liable, even though they may have in fact lacked probable cause.[8] *See Saldana v. Garza,* 684 F.2d at 1164 (even when the constitutional right and the elements of the substantive offense are clearly established, arresting officers may be immune if the arrest itself did not contravene "well-settled law"). The court concludes as a matter of law that, even assuming that the defendants did not have probable cause to arrest Stevens for theft, a reasonable person in their position would not have known that he lacked probable cause. The defendants are therefore immune from suit.

---

tions," 457 U.S. at 818, 102 S.Ct. at 2738, and it would seem that a police officer has no discretion not to arrest a person if he has a facially valid arrest warrant or probable cause to believe the person committed a felony. *But see Saldana v. Garza,* 684 F.2d 1159, 1164 (5th Cir.1982) (arresting officers "were acting pursuant to their discretionary authority"), *cert. denied,* 460 U.S. 1012, 103 S.Ct. 1253, 75 L.Ed.2d 481 (1983). In any event, the law appears to be otherwise. *See, e.g., Varela v. Jones,* 746 F.2d 1413, 1418 (10th Cir.1984) (recognizing a good-faith defense for arresting officers).

**8.** Because the test for probable cause and the *Harlow* test for qualified immunity are both phrased in terms of what a reasonable person could believe, the Third Circuit has concluded that there is no real difference between them. *See Losch v. Borough of Parkesburg, Pa.,* 736 F.2d 903, 909–10 (3d Cir.1984). Reading *Harlow* literally, it has said that the proper inquiry for determining qualified immunity is simply whether the constitution's probable cause requirement was clearly established. If it was,

then it doesn't matter that the underlying law to be applied in determining probable cause was not. 736 F.2d at 909–10. Other courts have implicitly rejected such an approach, holding that, even where the defendant may not have had probable cause, he may have qualified immunity if he could have reasonably believed he did. *See, e.g., G.C.R. Transp. Co. v. Fontaine,* 727 F.2d 7, 10 (1st Cir.1984).

This court finds the latter approach more reasonable. The Third Circuit approach effectively abolishes the qualified immunity defense. Since the probable cause requirement *is* clearly established, one who makes an arrest without probable cause can never have qualified immunity. However, if the defendant *had* probable cause, there is no constitutional violation and no need for qualified immunity. Immunity is meant to protect those who act reasonably in close cases where the existence of probable cause is uncertain but where it later turns out that probable cause was lacking. Police officers do not have the luxury that courts and juries do of making such judgments in a calm environment. They should therefore have some margin for reasonable error.

"Probable cause exists where 'the facts and circumstances within their [the officers'] knowledge and of which they had reasonably trustworthy information [are] sufficient in themselves to warrant a man of reasonable caution in the belief that' an offense has been or is being committed." *Brinegar v. United States,* 338 U.S. 160, 175–76, 69 S.Ct. 1302, 1311, 93 L.Ed. 1879 (1949) (quoting *Carroll v. United States,* 267 U.S. 132, 162, 45 S.Ct. 280, 288, 69 L.Ed. 542 (1925)).

Here, Officer Rasmussen knew that Stevens had control of the Coxes' vehicles, that he claimed some payment for having stored them on his property and that he would not give them back until he was paid.[9] What he didn't know was whether, given those facts, an offense had been committed. Nor could he reasonably have been expected to know that (even though as a police officer he might be expected to know the law of theft and arrests, *see Harlow,* 457 U.S. at 819, 102 S.Ct. at 2738), since Utah law on the subject was not clearly established.

It was the general rule at common law that one who took property under an honest belief that he was entitled to do so could not be guilty of larceny because he lacked the requisite mens rea for the offense (or "animus furandi"). *See generally* Annot. 13 A.L.R. 142 (1921), *supplemented in* 116 A.L.R. 997 (1938), and cases cited therein. Because there was no crime without the requisite mens rea, a police officer who knew that a suspect had taken property under a bona fide claim of right did not have probable cause to arrest him for larceny, even if the person in fact had no right to take possession of the property. *Hylton v. Phillips,* 270 Or. 766, 529 P.2d 906, 909 (1974). Utah apparently followed the common law rule. *See State v. Cude,* 14 Utah 2d 287, 383 P.2d 399 (1963); *State*

*v. Allen,* 56 Utah 37, 189 P. 84 (1920); *People v. Hughes,* 11 Utah 100, 39 P. 492 (1895).

In 1973, however, Utah revised its criminal code, doing away with the common law offenses against property and consolidating them into a new offense called "theft." Section 76–6–404 of the Utah Code establishes the elements of that offense: "A person commits theft if·he obtains or exercises unauthorized control over the property of another with a purpose to deprive him thereof." Utah Code Ann. § 76–6–404 (1978).[10]

Stevens does not dispute that he had control over the Coxes' property at the time of his arrest and that the Coxes had not authorized him to exercise that control. He claims, however, that the defendants did not have probable cause to arrest him because they knew that he was holding the vehicles under a claim of right and thus lacked "a purpose to deprive" the Coxes of their property. Because an essential element of the offense of theft was missing, Stevens argues, the officers could not have had a reasonable belief that he had committed any offense.

Utah's theft statute defines "purpose to deprive," however, to include an intent "[t]o restore the property only upon payment of a reward or other compensation." Utah Code Ann. § 76–6–401(3)(b). Because Stevens admittedly would restore the property only upon payment of claimed rent (a form of "compensation"), the defendants argue, he had a "purpose to deprive"; hence, all the statutory elements of the theft offense were present, and his arrest was justified.

The plain language of section 76–6–401(3)(b) supports the defendants' argument. *Cf. State v. Ferrel,* 679 P.2d 224, 229 (Mont.1984) (recognizing that "a literal

---

**9.** Officer Rasmussen's knowledge can be imputed to the other defendants. The arresting officer need not be personally aware of all the facts giving rise to probable cause; if the collective knowledge of the police establishes probable cause, that is sufficient. *See, e.g., United States v. Troutman,* 458 F.2d 217, 220 (10th Cir.1972).

**10.** The general theft statute is followed by several sections specifying ways in which a person can commit theft. *Id.* §§ 76–6–405 through –410. The defendants do not claim that Stevens's conduct came within any of these specific definitions.

interpretation" of a similar theft statute would at least make one guilty of theft who withheld property under a mistaken claim of right). And at least one court has construed a virtually identical statute to expand the common law liability for larceny. *Capson v. Superior Court,* 139 Ariz. 113, 677 P.2d 276 (1984) (en banc). Capson, the owner of a towing company, towed a car away from an apartment complex, apparently at the request of the apartment manager. The car had been parked in an area posted with No Parking signs stating that violators would have their cars towed away and would incur a seventy-five dollar towing fee. Capson refused to release the car until he had been paid the towing fee. He was then charged with theft. When the trial court denied his motion to dismiss, he filed a petition with the Arizona Supreme Court for special action.

The Arizona Supreme Court first held that Capson did not have a valid lien on the car for towing or storing it. It noted that no such lien existed at common law, and it could find no statutory basis for the claimed lien. The court then considered whether Capson's actions amounted to theft under Arizona law. Arizona law defined theft as the unauthorized control of another's property "with the intent to deprive" him of it. Ariz.Rev.Stat.Ann. § 13–1802(A), *quoted in* 677 P.2d at 279. It further defined "deprive" to include withholding property "with the intent to restore it only upon payment of reward or other compensation...." *Id.* § 13–1801(2), *quoted in* 677 P.2d at 279. The state conceded that Capson might be entitled to the seventy-five dollar towing fee but claimed that he was guilty of theft because he had no

legal right to hold the car. The Arizona Supreme Court agreed. The court stated:

> According to the undisputed facts, the petitioner, without lawful authority, knowingly controlled the property of another with the intent to restore it only upon payment of compensation. We believe the elements of the crime as specified under [the Arizona statutes] have been satisfied, and that the petitioner may be charged with theft.

677 P.2d at 279. Thus, under Arizona law, whether one who holds property as security for a claimed debt is guilty of theft depends on whether or not he has a recognized statutory or common law lien on the property. If he does not, he can be charged with theft.

The defendants argue that the result would be the same under Utah's admittedly comparable statute. They further argue that Stevens had no right to keep the property, even if he had a right to recover rent. And if Stevens could legitimately be charged with theft, the defendants had probable cause to arrest him for theft.

The plaintiff, on the other hand, claims that Utah still follows the common law rule that one who honestly claims a security interest in property cannot be liable for theft, despite the statutory definition of "purpose to deprive," which seems to expand the common law liability in such situations.[11] Language in one Utah case decided after Utah's revision of its criminal code tends to support the plaintiff's position. *State v. Kazda,* 545 P.2d 190 (Utah 1976). Kazda was charged with theft of some copper wire. He claimed that he had been given permission to cut and remove the

11. Stevens also argues that he had a common law right to hold the property as security for his claim of rent—that is, that he had an equitable possessory lien on the property. If that were true (a decision this court need not reach), even under the stricter, Arizona approach, which makes liability hinge on whether or not the defendant had a valid lien on the property, Stevens would not be guilty of theft. Stevens further argues that if he could not be found guilty of theft, the defendants could not have had probable cause to arrest him for theft. Such a position, however, would require police

officers to be experts in the law of liens. They would have to determine the validity of a claimed lien before they could ever arrest someone for theft in such cases. The law does not demand so much. Such determinations often puzzle lawyers and courts, and "police officers [simply] cannot be held to the standards of lawyers or judges." *Briggs v. Malley,* 748 F.2d at 719. In any event, officers should be entitled to rely on the opinion of the county attorney, the county's legal adviser, as to the validity of such a defense, which is essentially a question of civil, not criminal, law.

wire. In holding that the jury was properly instructed on his defense, the court restated the common law rule, citing to one of its pre–1973 decisions. However, the court has never construed section 76–6–401(3)(b) nor expressly held that it would not apply in a case such as this.

This court need not resolve the question here. The answer is properly left to the Utah Supreme Court. It is enough that the question is a fairly debatable one, one not clearly answered by the language of the statute and one which the highest court of the state has yet to resolve. Moreover, it is a question on which courts of other jurisdictions have reached varying results. *Compare State v. Ferrel,* 679 P.2d at 229 (Mont.1984) (rejecting a construction of Montana's theft statute that would make one guilty of theft who withheld property under a mistaken claim of right) *with Capson v. Superior Court,* 677 P.2d at 279 (Ariz.1984) (finding the elements of theft met where the defendant had an honest but mistaken belief that he had a right to hold the property as security). Given the unsettled state of the law, Officer Rasmussen could legitimately have questioned Stevens's innocence, even in light of Stevens's explanation of why he would not return the property.

**12.** Indeed, it was the Manti City Police Department's policy to consult with the city or county attorney to determine the best course of action whenever circumstances permitted. Officer Rasmussen's reliance on this established procedure for determining the existence of probable cause in close cases might alone be a good defense. *Cf. Hill v. Bogans,* 735 F.2d 391, 393 (10th Cir.1984) (officer's reasonable reliance on routine police procedures for establishing the existence of an outstanding warrant was a good defense in a § 1983 action). *See also Farmer v. Lawson,* 510 F.Supp. 91, 95 (N.D.Ga.1981) ("A police officer acting in reliance on a departmental standard operating procedure *may* ... be immune" from suit in a § 1983 action).

**13.** The Fifth Circuit has concluded under similar facts that a prosecutor's decision to issue an arrest warrant is a superseding cause that breaks the chain of causation. *Smith v. Gonzales,* 670 F.2d 522 (5th Cir.), *cert. denied,* 459 U.S. 1005, 103 S.Ct. 361, 74 L.Ed.2d 397 (1982). Before arresting Smith for incest, the arresting

A reading of the statute alone would only have confirmed Rasmussen's belief that he had probable cause. But the statute was ambiguous at best. Indeed, Officer Rasmussen admitted that he did not know whether Stevens's explanation negated the existence of probable cause for his arrest. The situation called for a studied legal judgment. Under the circumstances, Officer Rasmussen did all that he reasonably could to protect Stevens's rights: He presented the evidence to the County Attorney, the county's legal adviser, to determine whether he had probable cause to arrest Stevens for theft.[12] The County Attorney told him that he had probable cause, an opinion later backed up by a neutral magistrate. Under these facts, the defendants' reliance on the County Attorney's opinion immunizes them from liability.[13] *See Lavicky v. Burnett,* 758 F.2d 468, 476 (10th Cir.1985) (where an officer's duty is unclear, "it should be a defense that he relied upon the advice of the prosecuting attorney's office"); *Anderson v. Reynolds,* 342 F.Supp. 101, 112 (D.Utah 1972) (any problems with the statute under which a complaint was filed "were matters of law which it was within the peculiar province of the County Attorney's office ... to pass upon"), *aff'd,* 476 F.2d 665 (10th Cir.1973). *Cf. Smiddy v. Varney,* 665 F.2d 261, 267

officer had Smith's daughter tell her story directly to an assistant district attorney, who prepared an affidavit and a warrant for Smith's arrest. The court noted that, after the prosecutor "had his own first-hand encounter with the person complaining," he had a duty to make his own inquiry and determination as to whether there was probable cause to arrest Smith. The court held that his independent decision to prepare the affidavit and warrant "broke the causal chain" between the arresting officer and any constitutional violation. 670 F.2d at 526. This court prefers to foot its decision on qualified immunity grounds rather than on a lack of causation. To decide this case solely on causation grounds would make the prosecutor, who enjoys absolute immunity for at least some of his actions, "the sole protector of the fourth amendment." *Briggs v. Malley,* 748 F.2d at 721. By its holding, the court in no way excuses police officers from safeguarding fourth amendment rights when the law governing the application of the probable cause standard is clearly established.

(9th Cir.1981) (police officers who act in good faith "are not liable for damages suffered by the arrested person after a district attorney files charges unless the presumption of independent judgment by the district attorney is rebutted"), *cert. denied,* 459 U.S. 829, 103 S.Ct. 65, 74 L.Ed.2d 66 (1982).

In short, this court concludes as a matter of law that Utah law on the underlying issue here—namely, whether police officers have probable cause to arrest a person for theft if they know he holds property under a claim of right—was not "well established" when the defendants arrested Stevens. Even if the plaintiff's arrest was illegal because not based on probable cause (a question this court need not reach), it was not so illegal as to violate clearly established law. The defendants are therefore entitled to qualified immunity. *Cf. Heslip v. Lobbs,* 554 F.Supp. 694, 702 (E.D. Ark.1982) (finding arresting officers immune in a § 1983 action because of the "dearth of decisional authority pertaining to the issue" of whether one could be arrested for "public intoxication" in a private residence under Arkansas law, despite one Arkansas Supreme Court decision construing a predecessor statute). Their good-faith reliance on the opinion of the County Attorney on this unsettled question of law further immunizes them from liability.

*B. Malicious Prosecution and Abuse of Process*

As an alternative basis for section 1983 liability, Stevens claims that the defendants deprived him of liberty without due process of law, in violation of his fourteenth amendment rights, when they allegedly arrested him for the sole purpose of recovering the Coxes' property. Such an arrest, he claims, constitutes malicious prosecution and an abuse of process.

Malicious prosecution and abuse of process are separate torts. Malicious prosecu-

tion (also called malicious use of process) focuses on the initiation of process. To establish a claim of malicious prosecution, the plaintiff must show that the defendant instituted or continued a criminal proceeding against him without probable cause and with "malice," that is, with a primary purpose other than to bring an offender to justice. W. Prosser, *Law of Torts* 835 (4th ed. 1971); *see also* Restatement (Second) of Torts § 653 (1977).

■ Defendant Tidwell neither instituted nor continued Stevens's criminal prosecution but merely responded to the radio bulletin asking for help in locating Stevens; any malicious prosecution therefore cannot form the basis for a section 1983 action against him.[14]

■ Likewise, defendant Hillin had no part in initiating criminal proceedings against Stevens. He merely executed the warrant that the County Attorney had prepared and the magistrate had approved. His actions simply do not rise to the level of a constitutional violation for malicious prosecution.

■ Defendant Rasmussen, on the other hand, played a major role in the initiation of the criminal charges against Stevens and signed the information charging him with theft. Although such involvement may give rise to section 1983 liability for malicious prosecution, Rasmussen is entitled to qualified immunity for his actions. He cannot be liable if he had reasonable grounds for believing that his actions were legal. *See Dellums v. Powell,* 660 F.2d 802, 808 (D.C.Cir.1981). The court concludes that Rasmussen had reasonable grounds for believing that he had probable cause to swear out the information for Stevens's arrest, for the reasons set out in

---

**14.** Moreover, if the arrest warrant had not issued when Deputy Tidwell stopped Stevens, as Stevens claims, Tidwell could not be liable for malicious prosecution, "since the essence of that tort is the perversion of proper legal procedure," W. Prosser, *supra,* at 835, and there would have been no procedure for him to have perverted. On the other hand, even if the warrant had issued, Tidwell still could not be liable since it is undisputed that he had no part in procuring the warrant, nor, under Stevens's version of the facts, did he execute the warrant.

subpart A of this opinion.[15] Therefore, his actions in doing so, even if they would constitute malicious prosecution under state law, do not give rise to section 1983 liability.

The tort of abuse of process, in contrast to that of malicious prosecution, presupposes that the process was properly issued and focuses instead on the purpose for which it is being used. If one uses legal process primarily for an improper purpose (namely, one for which it is not designed), he can be liable for abuse of process. *See* Restatement (Second) of Torts § 682; W. Prosser, *supra,* at 856–57. Stevens contends that his arrest and detention constitute an abuse of process because the defendants' primary motive was to recover the Coxes' property.

■ Because abuse of process focuses on the misuse of process that has properly been set in motion, if abuse of process is to form the basis for Stevens's section 1983 claim the focus must be on the defendants' acts *after* Stevens was arrested and charged. The only acts Stevens alleges that could constitute an abuse of process are the defendants' alleged offers (on the advice of the County Attorney) to drop the charges against Stevens if he would return the property. Even assuming that the defendants made the offers and that their actions constituted an abuse of process under state law, the court concludes that those actions do not give rise to section 1983 liability.

The scope of common law tort liability and section 1983 liability are not coterminous. "[N]ot every tort amounts to a deprivation of constitutional rights...." *Lusby v. T.G. & Y. Stores, Inc.,* 749 F.2d 1423, 1431 (10th Cir.1984) (citing *Baker v. McCollan,* 443 U.S. 137, 142, 99 S.Ct. 2689, 2693,

61 L.Ed.2d 433 (1979)), *cert. denied,* —— U.S. ——, 106 S.Ct. 65, 88 L.Ed.2d 53 (1985). Malicious prosecution and abuse of process do not automatically constitute a denial of due process; the misuse of the legal procedure must be "egregious" to constitute "a deprivation of constitutional dimensions." *Id.* The court holds that the defendants' alleged actions are simply not egregious and thus do not constitute a deprivation of any constitutional right. The defendants could reasonably have thought that they had probable cause to arrest Stevens for theft. By offering on the advice of the County Attorney to drop the charges if Stevens returned the property, they were simply giving Stevens a chance to avoid what they thought was a legitimate criminal prosecution.[16]

In short, Stevens's section 1983 claim must fail because, to the extent that the defendants may have violated Stevens's constitutional rights their actions were objectively reasonable and therefore entitled them to qualified immunity, especially where, as here, they relied on the advice of the County Attorney at each step of the law enforcement process. And those actions that may not have been objectively reasonable simply do not rise to the level of a constitutional violation.

### III. Stevens's State Law Claims

The court's disposition of Stevens's section 1983 claim leaves Stevens with no basis for federal jurisdiction. Generally, the dismissal of federal claims before trial dictates that pendent state claims should also be dismissed. *United Mine Workers v. Gibbs,* 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966). The court therefore exercises its discretionary power to dismiss Stevens's pendent, state-law

---

**15.** Rasmussen's reliance on the advice of the County Attorney, which further supported his qualified immunity defense, is analogous to the common law "advice of counsel" defense, which arguably would preclude his liability for malicious prosecution under state law. *See* Annot., 10 A.L.R.2d 1215 (1950) and cases cited therein.

**16.** As it turned out, Stevens was eventually ordered to return the property anyway, by the presiding judge.

claims for lack of subject matter jurisdiction.

### IV. Stevens's Motion to Add Frischknecht as a Party

On September 20, 1985, after discovery in this case had been completed and after the time set for hearing dispositive motions, Stevens moved to add Paul R. Frischknecht, former Sanpete County Attorney, as a party defendant under rule 20 of the Federal Rules of Civil Procedure and to amend his complaint to add a cause of action relating to Frischknecht's activities. Frischknecht opposes the motion on the ground that he enjoys absolute immunity for all of his actions in connection with this case. Without reaching the merits of Frischknecht's claim of immunity, the court finds that the motion, coming after motions for summary judgment by all defendants which the court has granted, is untimely. At this stage of the proceeding, there is simply no case for Frischknecht to be added to. Stevens is free, of course, to bring his claims against Frischknecht in a separate action.

### V. Conclusion

For the reasons set forth above, the motions for summary judgment by defendants Tidwell, Hillin and Rasmussen are hereby GRANTED, the plaintiff's state-law claims for relief are DISMISSED without prejudice, and the plaintiff's motion to add Paul R. Frischknecht as a party defendant and to amend his complaint is DENIED.

IT IS SO ORDERED.